## SOUTHERN EXPRESS Co. *v.* L. & N. R. Co.

*(Circuit Court, M. D. Tennessee.* ———, 1880.)

1. RAILROADS—EXPRESS BUSINESS.—A railroad cannot discriminate in its own favor in the conduct of the express business.

2. SAME—RIVAL COMPANY—SUPERVISION.—A railroad cannot exercise a supervision over a rival company in the conduct of the express business.

3. SAME—EXPRESS COMPANY—RATES—NOTICE.—An express company is entitled to some notice from a competing railroad of an intended change in rates and privileges in the conduct of the express business.

KEY, D. J. In the investigation of this case I have come to no conclusions different from those announced by the circuit judge of this district in another controversy between the same parties in respect to the relations, duties, and general course of dealing between railroads and express companies. I am content to follow his rulings, so far as they are relevant to this suit, and shall enter upon no reiteration of the doctrines he has asserted.* The conduct of the express business is no part of the duty of railroads. Until within a recent period there has been, in this country, no effort on the part of railroads to carry it on. They have been content not only to permit this business to be done over their lines by others, but have fostered it, by the terms allowed and opportunities given, until it has grown into a distinct, separate, and organized branch of general business, different in its methods and characteristics from the natural and legitimate transactions of railroads.

Expressage has grown into a public necessity. The idea cannot now be entertained that railroads directly, or by indirection, can trammel or destroy express enterprises by excluding express companies from their lines, or by fettering them with unjust regulations or unfair discriminations. Nor can

---

*See *Dinsmore* v. *Louisville, Cincinnati & Lexington Ry. Co.* 2 FED. REP. 465. See, also, *Dinsmore* v. *Louisville, New Albany & Chicago R. Co.* 3 FED. REP. 593.

a railroad assume to itself the exclusive right or privilege of carrying on the express business over its own lines or any portion of them. I do not undertake to say that a railroad may not undertake to act as an expressman, but, if it should undertake to do so, it must do it as an expressman and not as a railroad. It is no part of its duty or privilege as a railroad. If, then, in the conduct of its business as expressman, its duties, relations, and operations be different and distinct from those appertaining to it as a railroad, it must treat its express department as though it had a separate individuality from that of the railroad—as though it were a stranger to the railroad in so far as it relates to its transactions with other express companies. It must give to it no opportunities, advantages, or privileges it does not allow to other express companies carrying on a like business. The very fact that the interests and rivalries of a railroad doing such a business tempt its officers and employes to secretly discriminate in its favor, and that it has so many opportunities and advantages in the conduct of its operations to covertly discriminate in its favor as against the express company which may be the rival of the railroad on its lines, demands that courts must hold railroads which incorporate expressage as a branch of their business transactions to a strict and rigid impartiality, so far as it may be possibly done.

In dealing with this case the Louisville & Nashville Express Company must be considered and treated by the railroad as though it were a company or person in nowise connected with or belonging to the railroad, in so far as privileges and advantages are given it. It must have no better treatment than a stranger company doing a similar business over its lines under like conditions. Both are to be regarded as customers of the railroad, and neither as being a part of it. If it be said that this is impossible, the reason for rigid enforcement, or as near an approach to an impartial administration of their affairs as may be, becomes the more imperative.

Are the principles herein stated observed in this case? Here are two companies doing an expressage over these lines.

One belongs to the railroad operating the lines, the other does not. Have they equality of position and impartial terms? I think not. Let us see.

October 6, 1880, an officer of the railroad, denominated the general superintendent of the express department, issued this order:

"*To Messengers:* Commencing with Monday, October 11, and until otherwise instructed by me, you will take a correct account of all matter carried by the Southern Express Company over the Selma Branch, Owensboro Branch, and the Mobile & New Orleans Railroad; this tally to include the contents of their safes and chests. If the Southern Express Company's messengers decline to give you a memorandum of the contents of their safes and chests, you must so note on the bottom of the tally sheet. We do not care for the name of the consignee of either money or freight. All we want is the articles, weight, or value, as the case may be."

Because the agents of the Southern Express Company refused to allow an inspection of the safes and chests, or to render a list of the contents, some of the agents of the defendant removed the packages from the train, or refused to carry them on the road. Thereupon this order was issued, dated October 12, 1880:

"We must not refuse safes or closed chests because the Southern Express Company refuses to allow us to inspect the contents, or to give us a list of contents; but each article offered to be carried is to be tallied by weight. But if several articles are enclosed in one closed chest or package, we must take them as one article. If they refuse to tally by weight, then refuse to carry the freight."

The superintendent of the express department of defendant says that "agents of the defendant were directed to ask the value of the contents of safes and weight of chests, and to place a value on safes if the agents of the plaintiff refuse to give the value."

Under these orders and regulations the agents of the express department of the defendant, as such, were directed

and required to exercise this supervision over and make these demands of the agents of the plaintiff, while the plaintiff or its agents had no corresponding or reciprocal right or privilege. It was the agents of defendant's express company that were required to thus supervise the plaintiff's transactions. The first order assumes the right of defendant's express company to demand and require an inspection of the safes, chests, and packages of the plaintiff, and the direction given, that if such inspection is refused, or the required memorandum furnished, the fact is to be noted on the tally sheet, indicates that further action of some sort is to be predicated upon this refusal. Nor does the order of October 12th oppose or deny this conclusion, but only directs that the chests must be carried notwithstanding the refusal; but, as the superintendent states, defendant's express agents were to place a value on the contents of the safes which they were not permitted to inspect, and of whose contents no memorandum was furnished. Without stopping to inquire whether the railroad, as such, could demand and enforce this supervision legally, it is enough to say that, according to the views herein expressed, it had no power to authorize and require that the rival and competitor of the plaintiff along and over its lines should exercise this superior prerogative over the business of plaintiff.

Again. It appears from the allegations of the bill, which, as to this, are not contravened or denied, that defendant took charge of these lines in June last, or before, and carried the agents and freight of plaintiff at the same rates and upon the same terms as had been done by defendant's predecessors, and continued to do so without objection or question until, without any notice, the order of sixth of October was issued and fare was demanded for plaintiff's messengers. Defendant says that it had no notice of the contract with its predecessors, yet it is reasonable to infer that some understanding, express or implied, had been existing between the parties in relation to the matter by which the rates had been fixed, and the terms and privileges established; and the continuance of

these rates and privileges for several months by the defendant after it took control of the lines was, at least, so far an adoption of the terms as to demand some notice in advance to plaintiff of the contemplated change, especially when the railroad was the competitor of the plaintiff in the operations affected by the change.

The general manager of the defendant says: "Under present existing circumstances I would even say that the railroads and the Louisville & Nashville Railroad Company are able to do the express business better than any express company possibly could. This is due to the consolidation of railways into great through lines. For example, the through route between New York and New Orleans *via* the Mobile & Montgomery Railway is operated by two companies only, * * * whilst on the same through route small express companies are in existence. It would, therefore, only be necessary to have one interchange, if both railroads work their own express. Further, the railroad companies can, through their employes, to-wit, agents at different stations, train men, baggage masters, etc., do the express business at lower rates and with much more satisfaction to the public than any express company could, as in many cases the railroad companies have not to employ several employes to do the express business. When the express companies were first established they were a matter of convenience, caused by the many railway companies of short distances between important points, where innumerable interchanges of business would have to be made, and it would have been inconvenient to manage this business by each company separately on its own line. It was then that, in conjunction with the railways, the express lines and fast through freight lines were permitted to come on railways under special, and in most cases exclusive contracts, giving them all possible inducements to establish through routes for fast freight or express business between grand commercial centers, thereby fostering interstate commerce. These express companies have, under the existing exclusive contracts with the railway companies, been enabled to establish, not only a

through business, but to make large and profitable returns to the stockholders. But, under the present system of consolidations of innumerable small companies into grand through lines, the necessity no longer exists, and for the aforesaid reasons the railway companies are much better able to do the express business themselves than any express company could, and the public will be vastly benefited thereby. The exclusive contracts which were originally granted to the different express companies, and which they have heretofore enjoyed, were granted merely for the reason that no two or more could have been allowed to come on one road, because the railways would not have been able to give them both the same facilities in space and in attendance, and it would be a matter of impossibility for any railway company to work its express business by more than one company to any advantage to the railway company, the express company, or to the public. More than one express company would increase the expense to the railway company in such a material way that very different terms would have to be made and compensation asked than their former exclusive contracts specified, as in most cases an additional car would have to be hauled for each company on the fast passenger trains, which carry the United States mail, and which, with the present condensed fast schedules and time cars, it would not be possible to do, except by providing specially-constructed machinery for the purpose, as we would, with the present facilities we have, delay the mails and cause inconvenience to the passengers and the public at large; when, in point of fact, a great many of the large railway companies of this country have already dispensed with fast freight lines and express companies on their different systems, and are now doing their own express business to the best satisfaction of themselves and the public. The railway companies are able to give as satisfactory attention to the collection, transmission, and delivery of express matter as the express companies can possibly give. The Louisville & Nashville Railroad Company is now doing its own express business, and meeting all the demands of the public for express accommodations."

This long quotation has been given that the theory of defendant on this question may be understood. Concisely stated, it is that when it was inconvenient for railroads to do express business, express companies were fostered and encouraged by them; but that now, as the business had become profitable, and railroads could conduct it conveniently, and as no railway could allow two express companies on its line, the railroad companies should monopolize the entire business on their lines, and, as some great lines had already done, dispense with the express companies and do the business themselves. Now, if in the field of fair competition the railroad has the advantages over express companies which are so forcibly stated by the general manager of defendant, and if, as he states, express companies had been encouraged and fostered by railroads until it had become a profitable business, making large returns to their stockholders, it would be unjust and most inequitable to allow railroad companies now, by unfair preferences, or the assumption of superior power and authority, to drive them from their lines that the railroads might do the business.

Under the views I have taken of this case a preliminary injunction must be awarded, continuing, until the further order or decree of the court, the provisions of the restraining order heretofore granted in the cause.